### No. 10,458

### Orleans

---

## MARITIME & MERCHANTS PROTECTIVE CO., INC., v. CRESCENT PAPER BOX FACTORY, INC.

---

(November 13, 1928. Opinion and Decree.)
(December 10, 1928. Rehearing Refused.)
(January 29, 1929. Writ of Certiorari and Review Refused by Supreme Court.)

St. Clair Adams and Lestie Moses, of New Orleans, attorneys for plaintiff, appellee.

Milling, Godchaux, Saal and Milling, of New Orleans, attorneys for defendant, appellant.

WESTERFIELD, J.  The plaintiff company is a detective agency engaged in the business of furnishing guards, watchmen, and special officers to protect and guard real and personal property from fire, theft and depredation. It brings this suit against defendant upon an alleged verbal contract, claiming $582.50 for the services of a night watchman, supplied by it to watch and guard a plant, located at St. Louis and N. Alexander Streets, in the City of New Orleans.

Defendant filed the equivalent of a general denial, in articulate form.

It is admitted that the services, for which compensation is claimed in this suit, were rendered by plaintiff, and, the reasonableness of the amount charged therefor is not seriously disputed.

The defense consists of a denial of the existence of the alleged contract between the plaintiff and defendant.

There was judgment below in plaintiff's favor and defendant has appealed.

The record establishes the fact that the building located at St. Louis and N. Alexander Streets, protected by plaintiff's service, was occupied by the New Orleans Corrugated Fibre Box Company, the Hardin Bag Company and the Crescent Paper Box Factory, Inc. (defendant herein) in common; that for several years prior to April 1, 1922, the plaintiff corporation had furnished the services of a night watchman, under a contract with the New Orleans Corrugated Fibre Box Company, the Hardin Bag Company and the Crescent Paper Box Factory, Inc., paying one-half of the expense of such service to the New Orleans Corrugated Fibre Box Company, in the proportion of 30% by the Hardin Bag Company and 20% by the defendant. On July 31, 1923, this service was discontinued, and written notice to that effect given the plaintiff company. Following the receipt of this letter, or on August 3, 1923, Mr. Guidry, Superintendent of the plaintiff corporation, called upon Mr. Harold M. Levy, the Secretary-Treasurer of the defendant company, at his place of business on the corner of Constance and Orange Streets, to discuss with him the service which had been discontinued. It appears that defendant maintains its principal establishment at Constance and Orange Streets, and its lesser establishment in the building which plaintiff was guarding.

Mr. Guidry testified that on the occasion of the visit referred to, Mr. Levy authorized him to continue the service, saying that he (Levy) would see that the bill was paid. It is this conversation that plaintiff relies upon as constituting a verbal contract. Levy admitted the statement imputed to him by Guidry, but, in explanation, declared that he was speaking as an officer of the New Orleans Corrugated Fibre Box Company. (Mr. Levy was also vice-president of that company.) He further stated that the letter,

discontinuing plaintiff's services, under its contract with the New Orleans Corrugated Fibre Box Company, was written by the president of that corporation, Mr. Ohnstein, and that, he was in ignorance of the fact that it had been written, or sent, until sometime in February or March, 1924, after the final discontinuance of the service by plaintiff because defendant's failure to pay. Mr. Levy insists that in everything he had say to Mr. Guidry, at that time, he was acting as an officer of the New Orleans Corrugated Fibre Box Company, and not as an officer of the Crescent Paper Box Factory, Inc., and in complete ignorance of the action of the president of the former concern in discontinuing the service. In support of his position, he points to the fact, that he instructed plaintiff to bill the New Orleans Corrugated Fibre Box Company for its service and that every bill rendered by the plaintiff corporation, was rendered to that company, until after the service had been finally discontinued.

Mr. Guidry, plaintiff's superintendent, explains the sending of the bills in this manner on the ground that, at all times, subsequent to the receipt of the written notice discontinuing the service by the New Orleans Corrugated Fibre Box Company, he considered the defendant as plaintiff's debtor, by reason of Mr. Levy's assurances that he would pay the bill, and would have sent the bill anywhere Mr. Levy directed. In support of this latter statement, he said, that following the receipt of Mr. Ohnstein's letter, he called his watchman to the phone for the purpose of having him return to plaintiff's office and terminate the watching contract, as instructed by the New Orleans Corrugated Fibre Box Company; that his watchman was prevented from leaving the premises of the defendant company by de-fendant's foreman, who, in the presence of the watchman, phoned Mr. Levy and reported to the watchman that Mr. Levy had instructed him to say that he (the watchman) should continue to watch the plant and that he (Mr. Levy) would see that the bill was paid. It is also in evidence, that, upon several occasions, such as Labor Day, Thanksgiving, Christmas and New Year, the defendant's foreman requested that a day watchman be sent to the plant, the watchman regularly supplied being a night watchman.

Mr. Dan's Lehon, president of the plaintiff company, testified that sometime in December, 1923, he called upon Mr. Levy to discuss the watching service and the failure to pay the bills; that on that occasion, Mr. Levy stated that there had been some difficulty with Mr. Ohnstein, president of the New Orleans Corrugated Fibre Box Company, which he referred to as a "family row," but, that he, Mr. Levy, would see that plaintiff's bill was paid in full, and to continue sending the bill to the New Orleans Corrugated Fibre Box Company and he would straighten the thing out.

It is defendant's contention that it, at no time, had any contract with the plaintiff company and that whatever Mr. Levy did, after the discontinuance of the contract with the New Orleans Corrugated Fibre Box Company, he did in ignorance of the fact that the contract had been terminated, and, as an officer of the New Orleans Corrugated Fibre Box Company, and, not of the Crescent Paper Box Factory, Inc. It is admitted that the services were rendered by plaintiff, and that defendant had the advantage of them, though it is insisted that it would be manifestly inequitable to hold defendant for the entire charge, when previously, under its arrangement with the New Orleans Corru-

gated Fibre Box Company, the same service had been obtained for 20% of the cost. It is argued that plaintiff has no claim against any one, because the only contract it held was with the New Orleans Corrugated Fibre Box Company, and that contract had been terminated prior to the service for which this suit is brought. In other words, plaintiff simply made a costly mistake.

Whatever may be plaintiff's difficulty, it is entirely due to the fact that Mr. Levy was the vice-president of one corporation and the secretary-treasurer of another, at one and the same time. Perhaps, plaintiff should have insisted upon a written contract with Mr. Levy, and it would then have appeared in what capacity he was acting. Such course would undoubtedly have been more prudent than a reliance upon the conversation between Mr. Guidry and Mr. Levy, especially in view of the circumstances of this case. But Mr. Guidry had received a letter from the New Orleans Corrugated Fibre Box Company, discontinuing and terminating the contract, which plaintiff had with that company, and was justified in presuming that Mr. Levy, a vice-president of that corporation, was familiar with the fact that such notice had been given. Consequently it seems to us, that Mr. Guidry might fairly have presumed that he was dealing with Mr. Levy in his capacity as secretary-treasurer of the defendant company and that it was in that capacity that Mr. Levy instructed him to continue the watching service.

This view finds support by the incident which occurred at the plant at the time the watchman was recalled, following the receipt of the order discontinuing the service, when the foreman, claiming to act upon the authority of Mr. Levy, insisted that the watchman remain upon the premises. It is further supported by the action of the foreman in ordering day watchman service during the holidays, Christmas, New Year, etc.

It must be conceded that the case is not free from doubt, and in reaching the conclusion we have, some consideration has been given to the fact that the defendant company has benefited by the services of plaintiff, for which plaintiff was obliged to pay, upon the principle that one should not enrich himself at the expense of another and, also to the fact that all the confusion that has arisen in this case has been due to Mr. Levy's ignorance of Mr. Ohnstein's action, under circumstances which do not seem to us, to acquit him, and through him, his company, of responsibility.

For the reasons assigned, the judgment appealed from is affirmed.